# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WAYNE HARRISON and <br> MARY HARRISON <br><br> Plaintiffs, <br><br> v. <br><br> CABOT OIL AND GAS CORPORATION <br><br> Defendant | 3:10-CV-312 <br> (JUDGE MARIANI) |

## MEMORANDUM OPINION

### I. Introduction

Before the Court is Defendant's Motion for Summary Judgment (Doc. 41) on Plaintiff's claim of fraudulent inducement and Defendant's counterclaim for equitable extension of the lease agreement. For the reasons set forth below, the Court will grant Defendant's motion with respect to Plaintiff's claim, deny Defendant's motion with respect to its counterclaim, and grant summary judgment *sua sponte* in favor of Plaintiff on Defendant's counterclaim. As such, the Court will deny Defendant's request for oral argument (Doc. 50) as moot.

### II. Statement of Facts and Procedural History

Plaintiffs filed suit on February 11, 2010, two-and-a-half years after signing the Lease with Defendant Cabot Oil and Gas Corporation ("Defendant or "Cabot"). (Doc. 1). Following an order granting in part and denying in part Defendant's Motion to Dismiss (Doc. 14), the sole remaining count in the Amended Complaint (Doc. 15) is fraudulent inducement,

and Defendant has asserted a counterclaim for equitable extension of the Lease. In Plaintiffs' Amended Complaint, they allege that Cabot's representative, Matthew Gayley, told Mr. Harrison that Cabot "would never pay any more than $100.00 per acre so he better take the $100.00 per acre and that the Plaintiff will never get anymore [sic]." (Doc. 15, ¶¶ 7, 12).

Plaintiff owns the property at issue in Susquehanna County.[1] (Doc. 15, Ex. A). The parties first made contact when Mr. Harrison received a letter dated August 6, 2007 from Gayley expressing an interest in leasing Plaintiff's property for exploratory drilling. (Doc. 47, Ex. B). In the letter, Gayley represented that Cabot had "already drilled one well in Dimock Township" which "looks to be very promising and profitable." (Id.). He also stated that at the depth Cabot was "planning to drill, which is 7,000 to 14,000 feet, gas formations can extend for thousands of feet in any direction."[2] (Id.). Gayley stated that Cabot was "willing to compensate you in the form of a signing bonus of $100 per acre as well as 1/8th royalty on all gas produced by a well near or on your property." (Id.). Should Plaintiff execute a lease agreement, he would receive his bonus check in the amount of $5,665.00 within sixty days. (Id.). Finally, Gayley asked Plaintiff to contact him by phone if he (Harrison) were interested in learning more about this opportunity. (Id.).

Plaintiff testified in his deposition that after receiving the letter, he spoke with Gayley, perhaps three times by telephone before signing the Lease. (W. Harrison Dep., Doc. 44,

---

[1] Any references to "Plaintiff" in this opinion refer to Wayne Harrison, as he is the only signatory to the Lease on behalf of the two plaintiffs.
[2] At Gayley's deposition, he testified that he did not remember where he obtained the information that the well looked promising and profitable or the details about the drilling. (Gayley Dep., Doc. 47, Ex. A, 44:11-23; 45:2-6).

2

Ex. A, 36:17-21). During the first call "in the middle of August," Gayley allegedly told Plaintiff that the offer was "a hundred dollars an acre." (*Id.* at 30:10-15). In response, Plaintiff "asked him if they could pay any more." (*Id.* at 30:19-21). Gayley's response was "[t]hat's all they was [*sic*] paying." (*Id.* at 31:4-8). Plaintiff stated that during that first conversation, Gayley did not mention anything about what Cabot would be willing to pay in the future (*Id.* at 31:9-12), nor did he articulate whether the $100 per acre offer was (1) what Cabot would be willing to pay for Plaintiff's property only, (2) what Cabot was offering Plaintiff's in particular county, or (3) what Cabot was offering throughout Pennsylvania. (*Id.* at 31:13-21). All that Gayley said was "[t]hat's all they was [*sic*] paying, . . ." (*Id.* at 31:19-21).

Counsel for Cabot then asked Mr. Harrison whether Gayley ever made the statements he was alleged to have made in the Amended Complaint. Plaintiff said Mr. Gayley "probably did." (Id. at 48:8-15). When Plaintiff was informed by Counsel for Cabot that Gayley denied ever making such statements, Plaintiff responded, "Well, he did." (*Id.* at 49:3-9).

Upon being pressed for Gayley's exact words, Plaintiff responded, "That they would never pay more than a hundred dollars and [*sic*] acre." (*Id.* at 49:13-15). In response to the same question later, Plaintiff stated Gayley's exact words were "that's all that I would be getting. You know, they said most of the people was [*sic*] getting 25." (*Id.* at 50:11-15). Plaintiff also confirmed that Gayley "never said . . . anything about what other natural gas or oil producers might be willing to pay." (*Id.* at 52:15-21). Counsel for Cabot repeatedly

3

asked whether Mr. Harrison was sure that was all Gayley said, and Plaintiff repeatedly answered in the affirmative. (*Id.* at 50:19-52:14). Plaintiff also stated that despite having the opportunity to, he never consulted a lawyer before signing the Lease. (*Id.* at 34:3-23). He also admitted that he did not discuss the issue with his neighbors to determine what lease terms they had been offered before he signed the Lease. (*Id.* at 34:24-35:4).

Mr. Harrison signed the Oil and Gas Lease ("Lease") on August 16, 2007. (Doc. 15, Ex. A). The term of the lease was for "five (5) years from this date . . . and as long thereafter as oil or gas is produced, or considered produced under the terms of this lease, in paying quantities from the premises or from lands pooled therewith, . . ."(*Id.* at ¶ 2). The Lease provided for a bonus payment to Plaintiff Harrison of $100 per acre plus a 1/8th royalty on any natural gas produced from the property. (*Id.* at ¶ 3; Doc. 24).

Defendant moved for summary judgment on both Plaintiff's claim and its own counterclaim. (Doc. 41). Thereafter, Plaintiff filed a brief in opposition and accompanying statement of facts,[3] along with an affidavit from Mr. Harrison. (Doc. 47). In his affidavit, Mr. Harrison swore that he had been "confused [at his deposition] and did not fully understand the question" regarding what Cabot was willing to pay. (Doc. 47, Ex. C, ¶ 12). He also stated that he was "confused as to whether I could have the questioned explained more." (*Id.* at ¶ 13). He went on to say that Gayley represented to him that Cabot would pay no

---

[3] Plaintiff's statement of facts failed to conform to the Local Rule 56.1 of the Middle District of Pennsylvania, which requires that "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, *responding to the numbered paragraphs* set forth in" (emphasis added) in the movant's statement of material facts. Failure to comply with the rule results in the facts being admitted as unopposed. Though the Court could grant Defendant's motion for summary judgment on this basis alone, it will proceed with an analysis on the merits.

4

landowner more than $100.00 per acre but that he was aware that Cabot had paid more than $3,000 per acre as a bonus payment to "many other landowners." (*Id.* at ¶¶ 14-15).

### III. Standard of Review on Motions for Summary Judgment

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Once the movant has made its showing, the non-movant must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In opposing summary judgment, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

"Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

## IV. Analysis

a. <u>Motion for Summary Judgment on Plaintiff's Claim of Fraudulent Inducement</u>

Plaintiff's sole claim against Defendant is a common law fraudulent inducement claim. To establish a fraudulent inducement claim under Pennsylvania law, Plaintiff must prove the following elements:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005). A plaintiff must prove the elements of fraud with clear and convincing evidence. *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 275-76 (3d Cir. 2010) (citing *Skurnowicz v. Lucci*, 798 A.2d 788, 793 (Pa. Super. Ct. 2002)). "A statement as to future plans or intentions is not fraudulent under Pennsylvania law unless it knowingly misstates the speaker's true state of mind when made." *Nat'l Data Payment Sys. Inc. v. Meridian Bank*, 212 F.3d 849, 858 (3d Cir. 2000) (citing *College Watercolor Group, Inc. v. William H. Newbauer, Inc.* 360 A.2d 200 (Pa. 1976)).

6

Through Mr. Harrison's deposition, Defendant has borne its burden of showing the absence of a genuine issue as to any material fact. *See Celotex*, 477 U.S. at 323. At his deposition, Mr. Harrison repeatedly said that the only statement Gayley made to him was that one hundred dollars per acre was all that Cabot was willing to pay. (W. Harrison Dep., 30:10-31:8). According to Mr. Harrison, Gayley did not specify whether one hundred dollars per acre was all that Cabot would pay to Plaintiff versus other landowners in Susquehanna County or versus other landowners in Pennsylvania. (*Id.* at 31:13-21). All that Gayley said, according to Plaintiff, was "[t]hat's all they was [sic] paying, . . ." (*Id.* at 31:19-21).

To Cabot's counsel, this testimony appeared to conflict with the allegations in the Amended Complaint, which alleged that Gayley had represented that "Defendant would never pay any more than $100.00 per acre so he [Mr. Harrison] better take the $100.00 per acre and that the Plaintiff will never get anymore [sic]." (Doc. 15, ¶¶ 7, 12). So, counsel asked Mr. Harrison whether Gayley had in fact made such a statement, and Plaintiff said Mr. Gayley "probably did." (W. Harrison Dep., 48:8-15). However, when pressed further, he said, "That they would never pay more than a hundred dollars and [sic] acre." (*Id.* at 49:13-15). In response to the same question later, Plaintiff stated Gayley's exact words were "that's all that I would be getting. You know, they said most of the people was [sic] getting 25."[4] (*Id.* at 50:11-15). Plaintiff also confirmed that Gayley "never said . . . anything about

---

[4] Assuming "other people" means neighboring landowners, this statement might support a claim of fraudulent inducement if Plaintiff was led to believe that he would be paid more than his neighbors (*i.e.*, the offer was especially attractive and he should take it), but there is no evidence that Gayley knew whether or not this statement was false. *See infra*.

7

what other natural gas or oil producers might be willing to pay." (*Id.* at 52:15-21). Counsel for Cabot repeatedly asked whether Mr. Harrison was sure that was all Gayley said, and Plaintiff repeatedly answered in the affirmative. (*Id.* at 50:19-52:14).

The burden is thus on Plaintiff to "offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact." *Lujan*, 497 U.S. at 888. This, Plaintiff has not done, and Plaintiff cannot rest on the allegations in the Amended Complaint that Gayley told Mr. Harrison that Cabot "would never pay any more than $100.00 per acre so he better take the $100.00 per acre and that the Plaintiff will never get anymore [*sic*]," (Doc. 15, ¶¶ 7, 12). *See Berckeley*, 455 F.3d at 201.

As a means of defeating Defendant's summary judgment motion, Plaintiff filed an affidavit in support of the Answer to Statement of Facts. (Doc. 47, Ex. C). In this affidavit, Mr. Harrison claims he was confused at his deposition, despite being asked multiple times whether he was sure of what Gayley had told him. (*Id.* at ¶¶ 12-13). Plaintiff has offered no satisfactory reason to explain the contradiction between the two conflicting statements and has submitted no evidence in support of Mr. Harrison's affidavit. Producing this belated statement was improper, and the Court will not consider the "sham affidavit" in deciding Plaintiff's fraudulent inducement claim. *See Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).

Therefore, other than this assertion in the Amended Complaint, Plaintiff has submitted no evidence in support of the fraudulent inducement claim. Based on Mr.

Harrison's own deposition testimony, the Court cannot find any evidence of fraud. In the brief in opposition, Plaintiff argues that a representative of Chesapeake offered him $2,200 per acre as a bonus payment. (Doc. 48, at 5). Notwithstanding Plaintiff's improper reliance on a legal memorandum – which is not evidence[5] – there is no supporting documentation for this statement. Furthermore, in the absence of any allegations that Gayley misrepresented what competitors of Cabot were offering landowners, what a competitor was offering is irrelevant to whether Defendant fraudulently induced Mr. Harrison to enter the Lease. Mr. Harrison did state in his (improper) affidavit that Defendant was offering $3,000 per acre to other landowners, but again, there is no supporting documentation for the averment. Thus, there is no evidence to support Plaintiff's allegations that Gayley's statements were "made falsely." *Eigen*, 874 A.2d at 1185.

Even if there were evidence that Defendant had offered other landowners more money, Mr. Harrison's statements do not establish that *Gayley* was aware of the alleged falsity of his statement that one hundred dollars per acre was the most Cabot was willing to pay to any landowner, or that Cabot authorized Gayley's statements when it knew them to be false. *Meridian Bank*, 212 F.3d at 858. As support for the claim of fraudulent inducement, Plaintiff says that Gayley made numerous factual statements in his initial letter without a proper basis, that is, with reckless disregard for their accuracy.[6] (Doc. 47, Ex. B).

---

[5] *See Berckeley*, 455 F.3d at 201.
[6] Specifically, Plaintiffs argue:

For instance, Gayley represented to Plaintiff in his initial letter that Cabot had "already drilled one well in Dimock Township" which "looks to be very promising and profitable." (*Id.*). He also stated that at the depth Cabot was "planning to drill, which is 7,000 to 14,000 feet, gas formations can extend for thousands of feet in any direction." (*Id.*). According to Plaintiff, because Gayley "was repeating words given to him from an unidentified source and which were the only sources of information which [Plaintiff] had to evaluate this proposal," (Doc. 48, at 10) this leads to the conclusion that his statements were misleading, and he was aware of their falsity when communicating them to Plaintiff.⁵ That Gayley did not know the factual basis for these statements (*see* Gayley Dep., Doc. 47, Ex. A, 44:11-23; 45:2-6) does not necessarily lead to the conclusion that (1) they were "made falsely" and (2) Gayley or Cabot knew they were false. There is no evidence of record that raises an issue of fact as to whether Plaintiff actually and justifiably relied on Gayley's statements in deciding to sign the lease. The circular argument that because Plaintiff signed the lease, he must have done so in reliance on Gayley's statement does not show a genuine issue of fact on this point, nor does it eliminate all other motives which may have caused Plaintiff to enter into the lease at issue.

---

> Gayley has made multiple representations which he did not know if they were accurate nor even where they originated. In every instance such proof can be developed through circumstantial means. The presence of higher bonus payments demonstrates the falsity of the statements from Mr. Gayley. The reckless disregard for the letter from Mr. Gayley to Wayne Harrison.

The Court will construe this confusing argument liberally to give Plaintiff the benefit of all reasonable inferences. *See Big Apple BMW*, 974 F.2d at 1363.

10

The Court also doubts whether Plaintiff's reliance on Gayley's statements was justifiable. *See Eigen*, 874 A.2d at 1185. At his deposition, Plaintiff admitted that he never consulted a lawyer before signing the Lease. (W. Harrison Dep., Doc. 44, Ex. A, 34:3-23). He also admitted that he did not discuss the issue with his neighbors to determine what lease terms they had been offered before signing the Lease. (*Id.* at 34:24-35:4). The Court is not mandating that all parties to contracts must consult an attorney before signing those contracts, but Plaintiff's failure to consult anyone, layperson or otherwise, before entering a five-year lease agreement is a factor the Court must consider.

Plaintiff has not offered any evidence of fraudulent inducement, much less evidence of fraud by clear and convincing evidence. *See Skurnowicz*, 798 A.2d at 793. Thus, even assuming Plaintiff has demonstrated all the other factors of fraudulent inducement, Plaintiff has failed to demonstrate that there are any genuine issues of material fact to justify denying an award of summary judgment in favor of Defendant. Accordingly, the Court will grant Defendant's motion for summary judgment on Plaintiff's fraudulent inducement claim.

### b. Motion for Summary Judgment on Defendant's Counterclaim

Defendant argues that by filing a lawsuit with this Court, Plaintiff effectively repudiated the lease agreement between the two parties. Therefore, Defendant asks this Court to equitably extend the Lease so that it may receive the full benefit of its bargain with Mr. Harrison. Defendant advances persuasive arguments in favor of its position that it has been deprived of its expectation interest, that is, the benefit of the bargain that it made with

Mr. Harrison. In response, Plaintiff argues that he did not prevent Defendant from its drilling operations, but that Defendant voluntarily chose to suspend drilling.

In support of its counterclaim, Defendant cites to multiple cases outside of this jurisdiction. *See, e.g., Rougon v. Chevron, USA, Inc.,* 575 F. Supp. 95 (M.D. La.1983); *Barby v. Cabot Petroleum Corp.*, 944 F. 2d 798, 799–800 (10th Cir. 1991); *Cheyenne Res., Inc. v. Criswell*, 714 S.W.2d 103, 105 (Tex. Ct. App. 1986). Defendant also attempts to distinguish the lone Pennsylvania case to address this particular issue, *Derrickheim Co. v. Brown*, 451 A.2d 477 (Pa. Super. Ct. 1982), and Judge Jones's opinion in *Lauchle v. The Keeton Group LLC*, 768 F. Supp. 2d 757 (M.D. Pa. 2011), which relied heavily on *Derrickheim*.

A brief summary of the facts and reasoning of the two cases will be useful to the disposition of this matter. In *Derrickheim*, the equitable owners of a tract of land, the Browns, entered a four-year oil-and-gas lease agreement with Derrickheim on July 26, 1969. The lease's term was for a period "of four (4) years . . . and as much longer as oil and gas is produced in paying quantities."[7] *Derrickheim*, 451 A.2d at 478. Derrickheim promptly began drilling operations, but within two months of executing the lease, it learned that there was a cloud on the Browns' title.[8] *Id.* at 478-79. Upon learning of this defect in title, Derrickheim ceased operations, capped the well, and requested that the Browns initiate

---

[7] The lease also contained an option for Derrickheim Co. to purchase the property for $6,000 during the primary term of the lease, which the state trial and appellate courts addressed. This issue is not present in this case, so the Court will not address it.

[8] In 1946, the Commonwealth had sold the property at a tax sale to the Hollidays (whom the Browns succeeded in interest in 1953) without giving notice of the sale to the prior owner (Frank Weber). *Id.* at 478.

an action to quiet title, which the Browns did not do. *Id.* at 479. Thereafter, Derrickheim performed no further actions on the well other than to mow the area around the well site. *Id.*

In September 1973, the Browns notified Derrickheim that the four-year term of the lease had expired, or alternatively, that Derrickheim had forfeited its interest in the lease. *Id.* Derrickheim responded that the lease was still valid and contested the lease's termination. However, nothing further happened until October 1977 when the Browns sold the property to the Sumoskes.[9] *Id.* In June 1978, Derrickheim filed a complaint in state court seeking a declaration that its oil-and-gas lease with the Browns in 1969 was valid.[10] The trial court concluded Derrickheim had been justified in discontinuing operations until the cloud on title was removed and held that the lease had been suspended until the title issue was resolved. The Superior Court agreed that "the cloud on the title relieved Derrickheim of any affirmative duty it may have had under the lease to drill for oil or make rental payments." *Id.* at 479-80. However, it disagreed that the cloud on title suspended the running of the lease because it ran counter to the express terms of the lease agreement.

> The lease specifically stated that it would run for a term of four years "and as much longer as oil and gas is produced in paying quantities." Since oil and gas was not being produced in paying quantities, the lease did not continue to run past the primary term of four years. The fact that it was "prudent" for Derrickheim to suspend operations upon learning of the cloud on the title does not justify disregarding the express language of the lease. The Pennsylvania Supreme Court has held in cases involving oil and gas leases containing lease terms of a period of years and "as much longer as oil and gas is produced" or similar language, that when oil and gas is no longer being

---

[9] The Browns had become the legal owners of the property in June 1977.
[10] In a separate action, the Browns and Sumoskes had obtained a judgment that the heirs of Frank Weber were forever barred from asserting any claim to the property. *Id.*

produced, the lessee becomes a tenant at will and the tenancy can be terminated by either party upon notice being given. *White v. Young*, 409 Pa. 562, 186 A.2d 919 (1963); *Clark v. Wright*, 311 Pa. 69, 166 A. 775 (1933); *Cassell v. Crothers*, 193 Pa. 359, 44 A. 446 (1899). Derrickheim's tenancy in the instant case therefore terminated upon Derrickheim's receipt of notice from the Browns that they considered the lease terminated.

*Id.* at 480.

In *Lauchle*, Judge Jones faced the very same question that this case presents: whether a lessor's filing of a lawsuit against an oil-and-gas drilling lessee during the pendency of the lease agreement acts as a repudiation of that agreement. Because it was a matter of first impression, Judge Jones relied heavily on *Derrickheim* in his attempt to discern how Pennsylvania courts would decide the issue.[11] Ultimately, he concluded that such an action by a lessor does not amount to a repudiation of the lease and therefore does not warrant an equitable extension of the lease term.

In *Lauchle*, the defendants attempted to distinguish *Derrickheim* by pointing out that in *Derrickheim*, it was the <u>lessee</u> who initiated the legal action to test the validity of the lease, whereas in *Lauchle*, the <u>lessor</u> brought suit. Judge Jones felt "this distinction puts too fine a point on the matter by placing undue emphasis on the party initiating the legal action. Establishing a party-driven, bright line rule as Chief Defendants suggest would discourage lessors from bringing actions to determine the validity of their leases, . . ."

---

[11] If a state's supreme court has not ruled on an issue, a federal court's role is do its best to predict how the state court would rule. *Roma v. United States*, 344 F.3d 352, 361 (3d Cir. 2003) ("Ordinarily, in so predicting, the rulings of intermediate state appellate courts must be accorded significant weight.") (internal citations and quotation marks omitted).

*Lauchle*, 768 F. Supp. 2d at 762. Judge Jones also emphasized certain policy considerations to justify his decision:

> In making this determination we are mindful of the fact that oil companies, like the Chief Defendants, wield significant, if not exclusive, power in the drafting of oil and gas leases. A determination that Plaintiffs had repudiated their leases via the filing of these actions further tips the balance in favor of the oil companies. Moreover, it would likely dissuade lessors from bringing potentially meritorious actions, which the case *sub judice* unquestionably was at its inception, in the future. Accordingly, deeming these leases to have been repudiated under the circumstances of this case is both bad law and even worse public policy, and we decline to accept Chief Defendants' invitation to so penalize Plaintiffs.

*Id.*

Defendant takes issue with this analysis because it interprets the above language to mean that Judge Jones considered an equitable extension of the lease a punitive measure against the lessors rather than a compensatory remedy for the lessees. Defendant further argues that *Derrickheim* is distinguishable not just because of who initiated the suit, but also because in *Derrickheim*, neither party was at fault for the cloud on title. Here, on the other hand, the reason for Defendant's predicament is that Plaintiff initiated this action in federal court and thereby foreclosed Defendant's opportunity to develop the well. Continuing its operations while this litigation was pending would have meant investing a significant amount of resources at the risk of a subsequent adverse judicial determination that the Plaintiff had been fraudulently induced to enter the Lease, thus rendering the Lease invalid.

Notwithstanding Defendant's arguments, the Court concludes that *Derrickheim* is binding and precludes an award of summary of judgment on Defendant's counterclaim.[12] The primary rationale of the Superior Court was that the express language of the lease was controlling despite any potential cloud on title. There, the lease's term was for a period "of four (4) years . . . and as much longer as oil and gas is produced in paying quantities." *Derrickheim*, 451 A.2d at 478. Four years had elapsed since the parties had signed the lease and Derrickheim had not produced oil in paying quantities.

Similarly, here, the Lease's term is for a period of five years starting from August 16, 2007. (Doc. 15, Ex. A). Because Defendant has suspended operations pending the outcome of this litigation, it is highly doubtful that it will be able to produce oil in paying quantities before the lease's expiration. As such, the lease most likely will expire on August 15, 2012, at which time Defendant will become a tenant at will whose tenancy can be terminated with adequate notice by Plaintiff. *Derrickheim*, 451 A.2d at 480.[13] Until the Pennsylvania courts say otherwise, this Court will not find that a party's filing of a lawsuit in federal court amounts to a repudiation of a lease between the parties, despite what courts in other jurisdictions have held. Finally, nothing prevents the parties from negotiating a new lease agreement whose terms will be acceptable for both parties.

---

[12] In so holding, this Court approves of Judge Jones's policy rationales for his decision in *Lauchle*. However, *Derrickheim* alone is sufficient to decide the issue without the Court having to rely on policy arguments, and the Court's decision is independent of the rationales espoused in *Lauchle*.

[13] The Court notes that the Pennsylvania Supreme Court decisions that the Superior Court relied on in *Derrickheim* for the proposition that at a lease's expiration the relationship between the parties converts to a tenancy at will remain good law.

In granting Defendant's motion for summary judgment on Plaintiff's claim and denying Defendant's motion for summary judgment on its counterclaim, the Court notes that there is nothing left to adjudicate in this case. Plaintiff, however, did not move for summary judgment on Defendant's counterclaim, so the Court will grant summary judgment *sua sponte* to Plaintiff on this issue. *See* FED. R. CIV. P. 56(f)(1). Though notice normally is required to the losing party, a district court may enter summary judgment *sua sponte* without notice under certain circumstances. *Gibson v. Mayor and Council of City of Wilmington*, 355 F.3d 215, 224 (3d Cir. 2004). Those circumstances exist here: "the presence of a fully developed record, the lack of prejudice, or a decision based on a purely legal issue." *Id.*[14]

Insofar as there is no genuine issue of material fact on this point, further factual development is unnecessary. Defendant is not prejudiced as it was the party which brought the motion, and by the Court's denial of that motion, there is nothing left to adjudicate in the case. Therefore, to notify Defendant that the Court is considering granting summary judgment *sua sponte* in favor of Plaintiff and give Defendant a reasonable time to respond would elevate form over substance. Finally, the Court's decision is based on a purely legal issue: whether under Pennsylvania law as expressed in *Derrickheim*, a party that initiates a lawsuit effectively repudiates a lease agreement. Despite what the law in other jurisdictions might be, in Pennsylvania, commencing litigation does *not* repudiate a lease agreement.

---

[14] The 2010 revisions to the Federal Rules of Civil Procedure formally authorized a district court to *sua sponte* enter summary judgment, recognizing the "procedures that have grown up in practice." FED. R. CIV. P. 56(f) advisory committee's note to 2010 amendment. Without explicitly referring to the amendments, the Third Circuit has continued to recognize the validity of the exceptions to the notice requirement contained in Rule 56(f) post-2010 amendments. *Minnesota Lawyers Mut. Ins. Co. v. Ahrens*, 432 F. App'x 143, 148 (3d Cir. 2011).

17

## V. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment with respect to Plaintiff's claim of fraud in the inducement but will deny with respect to Defendants' counterclaim for equitable extension of the lease. Further, the Court will grant summary judgment *sua sponte* in favor of Plaintiff on Defendant's counterclaim. Defendant's request for oral argument (Doc. 50) is denied as moot. A separate Order follows.

Robert D. Mariani
United States District Judge